UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

THE CITY OF NEW YORK,

                                        Plaintiff,

                    v.

AMERADA HESS CORPORATION;
ATLANTIC RICHFIELD COMPANY;
BP AMERICA, INC.;
BP AMOCO CORPORATION;
BP PRODUCTS NORTH AMERICA, INC.;
CHEVRONTEXACO CORPORATION;
CHEVRON USA INC.;
CITGO PETROLEUM CORPORATION;
COASTAL CORPORATION d/b/a COASTAL
        OIL NEW YORK, INC;
CONOCOPHILLIPS COMPANY;
CROWN CENTRAL PETROLEUM
        CORPORATION;
EL PASO MERCHANT ENERGY-
        PETROLEUM COMPANY;
EQUILON ENTERPRISES LLC;
EXXONMOBIL CORPORATION;
EXXONMOBIL OIL CORPORATION;
GETTY PETROLEUM MARKETING INC.;
GULF OIL LIMITED PARTNERSHIP;
IRVING OIL CORPORATION;
IRVING OIL LIMITED;
KOCH INDUSTRIES, INC.;
LYONDELL CHEMICAL COMPANY;
MARATHON ASHLAND PETROLEUM LLC;
MARATHON OIL COMPANY;
MOBIL OIL CORPORATION;
MOTIVA ENTERPRISES, LLC;
THE PREMCOR REFINING GROUP, INC.;
SHELL OIL COMPANY;
SHELL TRADING (US) COMPANY;
STATOIL MARKETING AND TRADING (US)
        INC.;
SUNOCO, INC.;
SUNOCO, INC. (R&M);
TEXACO, INC.;
TEXACO REFINING AND MARKETING, INC.;

Removed from:
Supreme Court of the State of New
York, County of Queens
Index No. 25720/03

**CV 04        860**

Case No.

Hon. _____

SPATT, J.

**NOTICE OF REMOVAL**

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ MAR 0 1 2004 ★

**BROOKLYN OFFICE**

TOSCO CORPORATION;
TOSCO REFINING COMPANY, INC.;
ULTRAMAR ENERGY, INC.;
ULTRAMAR LIMITED;
UNITED REFINING COMPANY;
UNOCAL CORPORATION;
VALERO ENERGY CORPORATION;
VALERO MARKETING AND SUPPLY
      COMPANY;
VALERO REFINING AND MARKETING; and
DOES 1-87, inclusive,

Defendants.

## NOTICE OF REMOVAL

TO THE HONORABLE JUDGE OF THIS COURT:

      The undersigned Defendants ("Defendants"), by their attorneys and pursuant to 28 U.S.C. § 1442(a)(1) and 1452(a), file their Notice of Removal of the action captioned as *City of New York v. Amerada Hess, et al.*, Index No. 25720/03, from the Supreme Court of the State of New York, Queens County, to the United States District Court for the Eastern District of New York.  The basis for removal is as follows:

      1.      On or about October 31, 2003, the City of New York ("Plaintiff") filed this action in the Supreme Court of the State of New York.  A copy of the Summons with Notice is attached hereto as Exhibit 1.  A copy of the Summons and Complaint is attached hereto as Exhibit 2 (the "Complaint").

      2.      28 U.S.C. § 1442(a)(1) provides that "[a] civil action . . . commenced in a State court . . . may be removed . . . to the district court of the United States for the district and division embracing the place wherein it is pending" when it is brought against "[t]he United States or any agency thereof or any officer (or person acting under that

2

officer) of the United States or of any agency thereof, sued in an official or individual

capacity for any act under color of such office. . ."

    3.    Additionally, 28 U.S.C. § 1452(a) allows a party to "remove any claim or

cause of action in a civil action . . . to the district court for the district where such civil

action is pending, if such district court has jurisdiction of such claim or cause of action

under section 1334 of this title." In turn, 28 U.S.C. § 1334(b) provides that the "district

courts shall have original but not exclusive jurisdiction of all civil proceedings arising

under title 11, or arising in or related to cases under title 11."

    4.    This action is one over which this Court has original jurisdiction under 28

U.S.C. § 1334 (bankruptcy); accordingly, removal is appropriate pursuant to 28 U.S.C. §

1452(a). Removal pursuant to 28 U.S.C. § 1442(a)(1) is also appropriate because the

Defendants were acting at the direction of a federal agency at the time of the conduct of

which Plaintiff complains. *See Winters v. Diamond Shamrock*, 149 F.3d 387, 398 (5th

Cir. 1998).

    5.    This Notice of Removal is filed in the District Court of the United States

for the district in which this suit was filed.

    6.    On information and belief, no defendant was served more than 30 days

prior to the filing of this Notice of Removal. Accordingly, this Notice of Removal is

filed within the time frame provided by 28 U.S.C. § 1446(b).

    7.    Removal pursuant to 28 U.S.C. § 1442(a)(1) does not require the consent

of all defendants. *See Bradford v. Harding*, 284 F.2d 307, 310 (2d Cir. 1960); *Benitez-

Bithom v. Rossello-Gonzalez*, 200 F. Supp. 2d 26 (D.P.R. 2002). Similarly, removal of

this case to this Court pursuant to 28 U.S.C. § 1452 does not require the consent of other

defendants. *Creasy v. Coleman Furniture Corp.*, 763 F.2d 656, 660 (4th Cir. 1985)

("Under the bankruptcy removal statute … any one party has the right to remove the state

court action without the consent of the other parties"). Although not required, written

consents are included in Appendix A.

8.      Pursuant to the requirements of 28 U.S.C. § 1446(d), Defendants will

promptly file a copy of this Notice of Removal with the Clerk of the Supreme Court of

the State of New York, County of Queens, where the action was originally filed.

Defendants have also served Plaintiff with this Notice of Removal.

## SUMMARY

9.      This removal is necessitated by a broadside attack on the comprehensive

federal system that regulates the content of gasoline, which expressly authorizes and

effectively requires the conduct that the Plaintiff seeks to prohibit based on far-fetched

theories of state common law. More than fifty lawsuits have been filed since September

30, 2003, in various state courts around the country, asserting that the inclusion of methyl

tertiary butyl ether ("MTBE") in gasoline constitutes an inherent design defect. A list of

the cases of which Defendants are aware is attached hereto as Exhibit 3. These cases --

seeking damages, fines, and injunctions under a patchwork of various states' laws as a

result of the gasoline industry's use of MTBE to comply with the federal Clean Air Act

("CAA") and its implementing regulations – threaten the integrated national system for

the supply and distribution of gasoline and highlight the need for federal judicial

resolution of these claims. At their core, these cases challenge who may determine the

content of gasoline nationwide: the Environmental Protection Agency ("EPA"), charged

4

by Congress with that authority, or disparate civil juries in state courts in multiple

jurisdictions in countless separate actions.

10.     This action, like all the others, seeks to hold oil industry participants

liable for conduct directed by the EPA -- the federal Oxy-Fuel and Reformulated Gasoline

Programs and inclusion of MTBE in gasoline to comply with the requirements of the

CAA.[1]

11.     In 1999, several MTBE cases were removed and consolidated in the

United States District Court for the Southern District of New York in MDL 1358 -- *In re*

*MTBE Products Liability Litigation.*  After the court dismissed much of those claims and

refused to certify four statewide purported class actions, the individual actions were

settled and dismissed.  The first Conditional Transfer Order to MDL 1358 has been

issued.  Simultaneous with this Notice of Removal, Defendants will give notice of

relatedness to the MDL Panel and request transfer of this action, and all other MTBE

actions being removed to federal court, to MDL 1358.

## BACKGROUND

12.     Section 211 of the Clean Air Act, 42 U.S.C. § 7545, establishes a

comprehensive federal program for regulating the content of motor vehicle fuels and fuel

additives.  Among other things, § 7545 empowers the EPA to require that all fuels and

---

[1] This lawsuit also implicates serious and substantial federal questions in an area -- the content of motor fuel
-- that has been pervasively occupied by federal statutes and regulations.  Piecemeal state court litigation
will result in scores of state judges across the country independently interpreting the CAA and EPA
regulations regarding fuel content.  Inconsistent decisions from state to state would interfere with and
disrupt the federal regulatory regime, putting the oil industry in the impossible situation of trying to comply
with federal regulations at the risk of incurring substantial state penalties and civil liability.  The orderly
supply of gasoline would be threatened as would the viability of the national gasoline distribution system.

fuel additives be registered with the EPA and empowers EPA to control or prohibit the content of all registered fuels and fuel additives for use anywhere in the United States.

13.    In 1977, Congress gave the EPA the express and exclusive authority to decide what fuels and fuel additives are sold nationwide. In § 7545(f)(1) and (3), Congress made it unlawful to sell any motor vehicle fuel or fuel additive "which is not substantially similar to any fuel or fuel additive" already on the market. Under § 7545(f)(4), Congress gave the EPA the exclusive authority to waive the prohibitions established under paragraphs (1) or (3) under certain conditions. Once a fuel is waived into commerce under § 7545(f)(4), it may be sold nationwide.

14.    The EPA has issued two § 7545(f) waivers for MTBE. The EPA issued the first waiver in 1979, allowing MTBE to be "introduce[d] into commerce" at concentrations of 0 to 7 percent by volume to enhance octane in gasoline following the ban on lead. *See* 44 Fed. Reg. 12,242, 12,243 (Mar. 6, 1979). The EPA thereafter determined that a fuel would be "substantially similar" if it contained oxygen at up to 2.0 percent by weight. *See* 46 Fed. Reg. 38,582 (July 28, 1981). The EPA issued the second MTBE waiver in 1988, "granting a waiver for a fuel consisting of a blend of up to 15 percent [MTBE] in unleaded gasoline . . . ." *See* 53 Fed. Reg. 33,846 (Sept. 1, 1988).

15.    In 1990, Congress comprehensively amended the CAA. As part of those amendments, Congress created two broad-ranging programs requiring petroleum refiners to blend oxygenates into gasoline sold throughout much of the country:  the Oxy-Fuel

6

Program ("OFP") and the Reformulated Gasoline ("RFG") Program. Both programs were designed to reduce emissions of toxic air pollutants.[2]

16.    In mandating the RFG Program, Congress required the EPA to promulgate regulations regarding fuel content which:

> [s]hall require the greatest reduction in emissions of ozone forming volatile organic compounds . . . and emissions of toxic air pollutants . . . achievable through the reformulation of conventional gasoline, taking into consideration the cost of achieving such emissions reductions, any nonair quality and other air-quality related health and environmental impacts and energy requirements.

42 U.S.C. § 7545(k)(1).

17.    Congress was well aware, when it enacted these oxygenate mandates, that only a small number of oxygenated compounds could be blended with gasoline to achieve the minimum oxygen levels set.

18.    Congress also knew, when it enacted the oxygenate mandates, that the gasoline industry would have to blend MTBE into at least some of the gasoline sold in OFP and RFG areas to comply with program requirements. Indeed, both Congress and the EPA fully understood that MTBE would be used in the vast majority of oxygenated gasoline sold in the United States. *See* 136 Cong. Rec. S 6383, 6384 (1990) (remarks of Sen. Daschle) ("EPA predicts that the amendment will be met almost exclusively by MTBE"). One Congressional estimate stated that "the MTBE market is expected to expand by more than 20 percent every year for the next five years" as a result of the CAA amendments. 136 Cong. Rec. S. 2280, 2289 (1990) (remarks of Sen. Daschle); *see also* 136 Cong. Rec. S 17773-74 (remarks of Sen. Daschle) ("the [RFG] program ...will

---

[2] "Oxygenates" are chemical compounds – ethers or alcohols – that, when blended with gasoline, materially increase its oxygen content, enabling it to burn "cleaner" and emit fewer volatile organic compounds into the air.

jointly mean that well more than 25 percent of our Nation's gasoline will contain oxygenates, including ethanol, ETBE, MTBE, and other oxygenates"); 136 Cong. Rec. H 12934 (remarks of Mr. Oxley) ("the oxygenated fuels program will allow for the use of MTBE and ethanol as additives to achieve the required level of oxygen"); 136 Cong. Rec. S 6459 (remarks of Sen. Daschle) (discussing the increased costs of gasoline complying with CAA on the assumption that MTBE would be used).

19.     Congress intended to affirmatively encourage the gasoline industry to use MTBE to meet the CAA mandates.  Conference Report, Clean Air Act Amendments of 1990, 1990 CAA Leg. Hist. 1451, 1787 ("[t]he agreement establishes an oxygen content level of 2.7 percent in 44 cities with carbon monoxide pollution, starting in 1992.  These provisions will encourage the use of oxygen-containing additives like ethanol and MTBE, a natural gas derivative"); 136 Cong. Rec. S 16954 (1990) (remarks of Sen. Chafee) (RFG Program "will encourage the use of oxygen-containing additives like ethanol and MTBE"); 136 Cong. Rec. S 17514 (1990) (remarks of Sen. Heinz) ("reformulated gasoline will also encourage the use of oxygen-containing additives like ethanol and MTBE").  In fact, Congress viewed the increased use of oxygenates like MTBE as "good for energy security and our balance of trade, as well as the environment" because RFG with a 15% MTBE content requires 15% less gasoline.  136 Cong. Rec. S 3513 (1990) (remarks of Sen. Daschle).

20.     Congress even drafted the Clean Air Act Amendments to ensure MTBE could be used to meet the oxygenate mandates.  For instance, the percentage weight requirements for oxygen were amended during the Senate's consideration of the 1990 Clean Air Act amendments to lower the amount of oxygen required in gasoline used in

the OFP from 3.1 percent to 2.7 percent, precisely to ensure that refiners could use

MTBE to meet the oxygenate mandate requirement:

> The level of 2.7 percent was chosen in part to provide more even
> opportunities for competition between the two major oxygenates,
> methyl tertiary butyl ether (or MTBE), and ethyl alcohol (or
> ethanol).  The [EPA] Administrator may not discriminate among
> these different oxygenates, and should encourage fair competition
> among them.

136 Cong. Rec. H 12848, 12859 (1990) (remarks of Mr. Sharp).

21.     Senator Daschle's comments are perhaps the most succinct evidence of

Congressional intent:  "We want MTBE . . . I want ETBE and ethanol and MTBE and

other fuels to play a role in achieving a variety of national objectives."  136 Cong. Rec. S.

2280, 2289 (1990).

22.     In short, in enacting the oxygenate mandates, Congress intended for

petroleum refiners to use MTBE in gasoline.

23.     Congress was also aware that efforts to comply with the new oxygenate

mandates for fuel content could have a serious impact on gasoline supplies on a national,

regional and local level.  Consequently, Congress authorized the EPA to delay each of the

OFP and RFG requirements for up to two or three years, respectively, if the EPA

Administrator ("Administrator") determined that domestic supplies of compliant gasoline

were inadequate.  42 U.S.C. § 7545(k)(6)(B) & (m)(2).

24.     In 1991, the EPA approved only the following compounds as additives to

achieve the requisite oxygen content in gasoline for the OFP:  MTBE, ethanol, methanol,

tertiary amyl methyl ether ("TAME"), ethyl tertiary butyl ether ("ETBE"), tertiary butyl

alcohol ("TBA"), and diisopropyl ether ("DIPE").  *Proposed Guidelines for Oxygenated*

*Gasoline Credit Programs Under Section 211(m) of Clean Air Act as Amended*, 56 Fed. Reg. 31151, 31154 (July 9, 1991).

25.    The EPA began implementing the OFP requirements in 1992. Pursuant to § 7545(m), the Administrator considered and approved changes to State Implementation Plans to require the use of oxygenated fuels in nonattainment areas for carbon monoxide.

26.    Like Congress, the EPA understood that MTBE would be "the most common oxygenating compound" used by refiners to comply with the CAA's new air emissions standards. *Approval and Promulgation of Implementation Plan*, 56 Fed. Reg. 5458, 5465 (Feb. 11, 1991).

27.    In 1994, the EPA reaffirmed its approval of MTBE by formally certifying MTBE as an acceptable oxygenate for the RFG program. *See* 40 C.F.R. § 80.46. Notably, the EPA again acknowledged that "[g]iven present and projected conditions, EPA . . . expects that MTBE and ethanol will be the most commonly used oxygenates during Phase I of the [RFG] program." *Final Rule, Regulation of Fuels and Fuel Additives: Standards for Reformulated and Conventional Gasoline*, 59 Fed. Reg. 7716, 7732 (Feb. 16, 1994). MTBE and the other six oxygenates approved for use in the OFP were the only oxygenates available for use in the RFG.

28.    RFG requirements went into effect on January 1, 1995.

29.    Thus, to refine, distribute, or market gasoline in any area subject to OFP or RFG requirements, consistent with EPA regulations, refiners must include one of the seven approved oxygenates in gasoline at the requisite concentration.

30.    In promulgating its requirements for RFG, the EPA specifically and expressly concluded that its fuel content regulations preempted State law relating to the

content of such fuel. *Final Rule, Regulation of Fuels and Fuel Additives: Standards for Reformulated and Conventional Gasoline*, 59 Fed. Reg. 7716, 7732 (Feb. 16, 1994).

31.     The EPA's regulations pertaining to fuel content cover more than 400 pages of the Code of Federal Regulations, set forth at 40 CFR Parts 79 and 80.

32.     At the time the EPA promulgated the RFG regulations, it knew of MTBE's potential to contaminate groundwater. *See Final Rule, Testing Consent Order on Methyl Tert-Butyl Ether and Response to the Inter-Agency Committee*, 53 Fed. Reg. 10391, 10392 (Mar. 31, 1988). It also knew there was not a sufficient capacity of ethanol, on a nationwide basis, nor sufficient infrastructure for ethanol, to comply with the regulation. Accordingly, the EPA expected that the industry would extensively use MTBE to comply with the oxygenate requirement. *See, e.g.,* 59 Fed. Reg. 7716, 7732; *Regulation of Fuel and Fuel Additives: Reformulated Gasoline Adjustment*, 65 Fed. Reg. 42920 (July 12, 2000). To comply with the EPA's oxygenate requirements for RFG, refining companies – many of whom are defendants in this case – added MTBE to their gasoline.

## BASIS FOR REMOVAL

33.     28 U.S.C. § 1442(a)(1) permits removal by corporations acting under the direction of federal officers or agencies.

34.     To remove a case under § 1442(a)(1), the removing party must establish that (i) it is a person under the statute; (ii) it has a colorable federal defense; and (iii) there is a sufficient causal nexus between the conduct directed by the federal officer or agency and the harm about which Plaintiff complains. *See* 28 U.S.C. § 1442(a)(1); *see also*

11

*Jefferson County v. Acker,* 527 U.S. 423, 431 (1999); *Winters v. Diamond Shamrock Chem. Co.,* 901 F. Supp. 1195 (C.D. Tex. 1995), *aff'd,* 149 F.3d 387 (5th Cir. 1998).

35.     A corporation is a "person" for purposes of the federal officer removal statute. *See, e.g., Camacho v. Autoridad de Telefonos de Puerto Rico,* 868 F.2d 482 (1st Cir. 1989); *Ward v. Congress Const. Co.,* 99 F. 598 (7th Cir. 1900); *Arness v. Boeing N.A., Inc.,* 997 F. Supp. 1268, 1271 (C.D. Cal. 1998); *Ryan v. Dow Chem. Co.,* 781 F. Supp. 934 (S.D.N.Y. 1992).

36.     Defendants have a legitimate federal defense:  Plaintiff's claims are preempted by federal law.[3]  Gasoline containing MTBE cannot be considered defective when the EPA mandated RFG and approved and effectively required MTBE as an oxygenate in RFG.

37.     There is a strong causal nexus between the EPA's oxygenate mandate and the conduct about which Plaintiff complains.  The industry's use of MTBE in gasoline was a necessary, known, and expected result of congressional legislation and EPA regulations requiring petroleum refiners to use oxygenates in gasoline.

38.     The refiners manufacturing gasoline with oxygenates were required to use MTBE to comply with the CAA because of the limited infrastructure and availability of

---

[3]  Several courts have considered the preemption issue in MTBE litigation. *Kubas v. Unocal Corp.,* 2001 WL 1940938 (Cal. Supr. Ct., LA. Cty., Aug. 23, 2001); *Hixson v. Unocal Corp.,* No. DC195295 (Cal. Supr. Ct., LA. Cty., Aug. 23, 2001); *Holten v. Chevron USA,* 2001 U.S. Dist. LEXIS 17599 (D.N.J. July 3, 2001); *Coppola v. Amerada Hess Corp.,* No. 2001/3995 (N.Y. Supr. Ct., Dutchess Cty., July 31, 2002); *Molloy v. Amerada Hess Corp.,* No. 2001/3996 (N.Y. Supr. Ct., Dutchess Cty., Aug. 1, 2002). *See also In re MTBE,* 175 F. Supp. 2d 593, 611-16 (S.D.N.Y. 2001); *Contra Oxygenated Fuels Assoc., Inc. v. Davis,* 331 F.3d 665 (9th Cir. 2003); *Abundiz v. Explorer Pipeline Co.,* 2002 WL 1592604 (N.D. Tex., July 17, 2002); *Oxygenated Fuels Assoc., Inc. v. Pataki,* 158 F. Supp. 2d 248 (N.D.N.Y. 2001).  Although this is not an issue of first impression, no court has addressed preemption in the context of an all-out assault on one of the central pillars of interstate commerce, thus raising precisely the factual issue acknowledged by many of these courts -- that these tort claims have the potential to interfere with federal gasoline regulation.

ethanol. Therefore, a federal directive caused the conduct about which Plaintiff

complains and removal under 28 U.S.C. § 1442(a)(1) is appropriate.

39.     Additionally, 28 U.S.C. § 1334(b) provides that the "district courts shall

have original but not exclusive jurisdiction of all civil proceedings *arising under* title 11,

or *arising in* or *related to* cases under title 11."

40.     On April 12, 1987, Texaco Inc., predecessor in interest to Defendants

Chevron Texaco Corporation and Texaco, Inc. (collectively the "Texaco Defendants"),

filed a voluntary petition under Chapter 11 of the Bankruptcy Code in the United States

Bankruptcy Court for the Southern District of New York, Jointly Administered Chapter

11 Case Nos. 87-B-20142, 87-B-20143, and 87-B-20144.

41.     On March 23, 1988, the United States Bankruptcy Court for the Southern

District of New York confirmed Texaco's Second Amended Joint Plan of Reorganization

(the "Confirmation Order").  Pursuant to the Confirmation Order, Texaco was discharged

forever from any and all claims or liabilities arising before the date of the entry of the

Confirmation Order, whether or not a proof of claim was filed, and whether or not the

holder of such claim accepted the Plan of Reorganization.  Furthermore, pursuant to

Bankruptcy Code § 524(a)(2) and the Confirmation Order, any "commencement... of any

action, the employment of process, or any act to collect, recover or offset any debt

discharged herein" was permanently enjoined and restrained.

42.     Additionally, pursuant to the Confirmation Order, all property of Texaco's

estate and all property dealt with by the plan are free and clear of all claims and interests

of creditors.  Furthermore, Bankruptcy Code § 1141(c) provides that, "after confirmation

of a plan, the property dealt with by the plan is free and clear of all claims and interests of creditors...."

43.     This action seeks recovery from Texaco's successors in interest for alleged claims arising prior to entry of Texaco's Confirmation Order.  The Confirmation Order discharged such claims. 11 U.S.C. §§ 1141 and 524.  Plaintiff's Complaint therefore is a collateral attack upon the Confirmation Order and it is filed in clear violation of the injunction contained in that Order.  The United States Bankruptcy Court for the Southern District of New York which issued the Confirmation Order has held that the pursuit of discharged claims against Texaco violates the Bankruptcy Court's Confirmation Order and the discharge injunction. *Texaco Inc. v. Sanders (In re Texaco Inc.)*, 182 B.R. 937 (Bankr. S.D.N.Y. 1995).

44.     Here, Plaintiff alleges pre-confirmation claims that attack the integrity of Texaco's Confirmation Order, and therefore implicate Texaco's substantive federal law-based rights created by the Bankruptcy Code.  Texaco's Confirmation Order and the Bankruptcy Code bar both prosecution of pre-confirmation claims and the claims themselves.  Therefore, a matter such as the Plaintiff's state court lawsuit, which implicates enforcement and construction of Texaco's Confirmation Order, is a proceeding within core federal bankruptcy jurisdiction.  *See* 28 U.S.C. § 157(b) (those matters within the "core" bankruptcy jurisdiction of federal courts include "determinations as to the dischargeability of particular debts"); *Matter of Chicago, Milwaukee, St. Paul & Pac. R.R.,* 6 F.3d 1184 (7th Cir. 1993) (matter which invokes the issue of a bankruptcy discharge falls within federal bankruptcy jurisdiction); *In re National Gypsum Co.,* 118 F.3d 1056, 1064 (5th Cir. 1997) (proceeding seeking

interpretation of discharge provision of confirmation order "is a core proceeding arising under title 11").

45.     The court that issued the Confirmation Order, the Bankruptcy Court for the Southern District of New York, is the most appropriate court to interpret the scope of its own order.  The Texaco Defendants reserve the right to seek transfer of this case or any proceeding herein to the United States Bankruptcy Court for the Southern District of New York or to apply to the United States Bankruptcy Court for the Southern District of New York for an order enforcing its Confirmation Order and the Bankruptcy Code.

46.     In addition to the jurisdiction over the claims against Defendants, as set forth above, this Court has supplemental jurisdiction over the remainder of the state court claims pursuant to 28 U.S.C. § 1367.

WHEREFORE, Defendants hereby remove to this Court the action captioned *City of New York v. Amerada Hess, et al.*, Index No. 25720/03, from Supreme Court of the State of New York.

41544v.1 <NewYork> 011786

Respectfully submitted,

SUNOCO, INC. and SUNOCO, INC. (R&M)

By: _Keith T. Ts ie_

One of Their Attorneys

Dated:  March 1, 2004

John S. Guttmann
Beveridge & Diamond, P.C.
1350 I Street, NW
Suite 700
Washington, DC 20005
(202) 789-6020
(202) 789-6190 (fax)

and

Heather M. Fusco
Keith T. Tashima (KT 9248)
Beveridge & Diamond, P.C.
477 Madison Avenue, 15th Floor
New York, NY 10022
(212) 702-5400
(212) 702-5450 (fax)

*Attorneys for Sunoco, Inc. and Sunoco Inc. (R&M)*

41526v.1 <NewYork> 011786

Respectfully submitted,

*Peter Bellacosa*

J. Andrew Langan
Mark S. Lillie
R. Chris Heck
KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, Illinois 60601-6636
312-861-2000
312-861-2200 (Facsimile)

Peter Bellacosa (PB-2394)
KIRKLAND & ELLIS LLP
Citigroup Center
153 East 53rd Street
New York, New York 10022-4675
212-446-4800
212-446-4900 (Facsimile)

Attorneys for Defendants:*
Atlantic Richfield Company, BP America, Inc., BP
Corporation North America Inc. (formerly known as
BP Amoco Corporation), and BP Products North
America, Inc.

---

\* To the extent the Summons erroneously names BP entities that do not exist or no longer exist, the consent of such fictitious or non-existent entities is not necessary for removal. To the extent joinder in or consent to removal is required, the BP group of companies, and each of them, join in and consent to removal.

Respectfully submitted,

CHEVRONTEXACO CORPORATION,
CHEVRON U.S.A., INC. and TEXACO
INC.

By: _____
      One of Its Attorneys

Dated: February 27, 2004

Richard E. Wallace, Jr.
Peter C. Condron (PC4818)
WALLACE KING MARRARO & BRANSON PLLC
1050 Thomas Jefferson Street, N.W.
Washington, D.C.  20007
Telephone:  202.204.1000
Facsimile:  202.204.1001

Dated:  February 17, 2004

Respectfully submitted,

CITGO Petroleum Corporation

By: _____
Samuel J. Abate, Jr. (SA 0915)
McCarter & English, LLP
245 Park Avenue
New York, New York 10167
(212) 609-6800
(212) 609-6921 (fax)

Of counsel:

Nathan P. Eimer (NE 2996)
Pamela R. Hanebutt (PH 4515)
Lisa S. Meyer (LM 2003)
Eimer Stahl Klevorn & Solberg
224 S. Michigan Avenue
Suite 1100
Chicago, Illinois 60604
(312) 660-7600
(312) 692-1718 (fax)

Respectfully submitted,

EXXON MOBIL CORPORATION,
EXXONMOBIL OIL CORPORATION and
MOBIL CORPORATION

By: _____
      One of Its Attorneys

Dated: February 23, 2004

Peter John Sacripanti (PS 8968)
James A. Pardo
Stephen J. Riccardulli
McDERMOTT, WILL & EMERY
50 Rockefeller Plaza
New York, New York 10020
Tel: 212-547-5400
Fax: 212-547-5444

Respectfully submitted,

EQUILON ENTERPRISES LLC; MOTIVA
ENTERPRISES LLC; SHELL OIL
COMPANY; SHELL TRADING (US)
COMPANY and TEXACO REFINING
AND MARKETING, INC.

By: _____
　　　One of Its Attorneys

Dated: February 27, 2004

Richard E. Wallace, Jr.
Peter C. Condron (PC4818)
WALLACE KING MARRARO & BRANSON PLLC
1050 Thomas Jefferson Street, N.W.
Washington, D.C.  20007
Telephone:  202.204.1000
Facsimile:  202.204.1001

Jeffrey G. Stark
MEYER, SUOZZI, ENGLISH & KLEIN, P.C.
1505 Kellum Place
Mineola, NY 11501
Telephone:  (516) 741-6565
Facsimile:  (516) 741-6706

Respectfully submitted,

Statoil Marketing & Trading (US) Inc.

By: _____
       One of Its Attorneys

Dated: February 18, 2004

Vivian M. Quinn (VQ0854)
Nixon Peabody LLP
1600 Main Place Tower
Buffalo, NY 14202
T: 716-853-8100
T: 716-853-8109

B64847.1